## CLEMMER'S ADM'R v. JEFFERSON STANDARD LIFE INS. CO.

District Court, W. D. Virginia.
Sept. 11, 1934.

116

S. D. Timberlake, Jr., and J. Wesley Taylor, both of Staunton, Va., for plaintiff.

Charles Curry, of Staunton, Va., and Laird L. Conrad, of Harrisonburg, Va., for defendant.

PAUL, District Judge.

The defendant in its motion to set aside the verdict of the jury and to grant a new trial has assigned a number of errors. However, many of these merely advance in different form the same question raised in others and all may be considered under several groupings.

1. In the chronological order of the trial, we come first to defendant's insistence that its special plea No. 4 set up an equitable defense and that the questions raised thereon should have been determined by the court, sitting as a chancellor, and should not have been submitted to the jury. This plea is to the effect that the insured, in his application for insurance, made certain false representations as to his habits and as to previous medical treatment, which representations were material to the issuance of the policy.

I think the contention of defendant is plainly untenable and to accept it would be to violate precedents long and strongly established in the federal jurisprudence and would ignore rights guaranteed to litigants by specific provisions of the Federal Constitution and statutes. Article 7 of the Amendments to Constitution preserves the right of trial by jury in actions at law, and title 28, § 384 U. S. C. (28 USCA § 384), prohibits the maintenance of a suit in equity where a plain, adequate, and complete remedy may be had at law. It has long been settled and frequently reiterated that, where a loss has occurred under an insurance policy, a bill in equity will not lie to compel cancellation of the policy or to enjoin suit upon it on the ground of fraud in its procurement where the fraud may be set up as a defense to an action at law upon the policy. That the defense of fraud in the procurement may be interposed at law is equally well recognized. Home Ins. Co. v. Stanchfield, Fed. Cas. No. 6,660, 1 Dill. 424; Marine Ins. Co. v. Hodgson, 7 Cranch, 332, 3 L. Ed. 362; Phoenix Mut. L. Insurance Co.

v. Bailey, 13 Wall. 616, 20 L. Ed. 501; Cable v. U. S. Life Ins. Co., 191 U. S. 288, 24 S. Ct. 74, 48 L. Ed. 188; Aetna Life Ins. Co. v. Smith (C. C.) 73 F. 318; The Sailors v. Woelfle, 118 Tenn. 755, 102 S. W. 1109, 12 L. R. A. (N. S.) 881; Riggs v. Union Life Ins. Co. (C. C. A.) 129 F. 207; New York Life Ins. Co. v. Marshall (D. C.) 21 F.(2d) 172; Continental Casualty Co. v. Yerxa (D. C.) 16 F.(2d) 473; Aetna Life Ins. Co. v. Kennedy (C. C. A.) 31 F.(2d) 971. Examination of these cases shows that the establishment and maintenance of the rule therein pronounced has as an actuating motive adherence to the statutory and constitutional provisions which have been cited, namely, the insistence that trials be had at law where the remedies are adequate and the related right of trial by jury.

To adopt the contention of defendant would be to nullify the effects of these long-established precedents. There are constantly coming before the courts actions at law upon insurance policies where payment is contested upon the ground that the insured made false representations in the application for the insurance; in many cases this is the sole defense made by the insurer. Yet, according to defendant's contention, the interposition of this defense would transform each of these cases into a suit in equity, with the issue of fact involved triable by the chancellor without the intervention of a jury. The right of a litigant to have the issues involving his rights tried at law by a jury cannot be thrown aside in such manner. The insurer would, by such procedure, acquire the very rights which have been repeatedly denied when it has sought to bring its own suit in equity.

Title 28, § 398, U. S. C., 28 USCA § 398 (section 274b, Judicial Code) permitting the filing of equitable defenses in actions at law, upon which defendant relies, is not to be extended to the point here contended for. It is said in Ford v. Huff (C. C. A. 5) 296 F. 652, at page 658: "The term 'equitable defenses,' within the meaning of section 274b of the Judicial Code, includes a state of facts which, by virtue of doctrines recognized by courts of equity alone, has the effect of barring, or rendering unenforceable against a defendant in a suit, the claim asserted by the plaintiff therein."

But fraud is not a doctrine "recognized by courts of equity alone." It may be a legal defense and is to be so treated when the issue of fact raised by it may be properly and adequately determined by the machinery of a court of law. In Carey v. McMillan (C. C. A. 8) 289 F. 380, at page 387, it is said: "It is contended * * * that, if actions at law were brought by the receiver against the stockholders whose notes he holds, and they should set up fraud as a defense, this issue would have to be tried on the equity side of the court, under section 274b, Judicial Code. * * * The contention cannot be sustained. Fraud may be either a legal or an equitable defense. If asserted simply to defeat plaintiff's cause of action, the issue is tried in the same way as other legal issues."

A complete answer to defendant's position would seem to lie in the fact that for long years before the enactment of the statute upon which defendant relies fraud in the procurement of a contract has been recognized as a defense available in an action at law on the contract. See Phoenix Mut. L. Insurance Co. v. Bailey, Home Ins. Co. v. Stanchfield, and other cases cited above, where equitable relief was denied for the very reason that this defense was available at law. And it was certainly not the purpose of the statute (title 28, § 398, U. S. C., 28 USCA § 398) to transform such a defense from a legal to a strictly equitable one, providing for the trial of a case partly in equity and partly at law, and thereby adding to its complications and delay. The purpose of the statute is to simplify and expedite the disposition of litigated matters by permitting the consideration in lawsuits of defenses not theretofore available in that forum; it was not intended to complicate the law by compelling defenses long available at law to be pulled out of the law case and tried in equity. And the mere fact that the defendant attaches to its plea of fraud in the procurement of the contract a request that the policy be canceled and annulled does not give it the right to have the issue taken from a jury and tried by equity procedure.

Even if we were to accept defendant's contention that the defense of fraudulent representation in procurement of the contract is strictly an equitable one, it is my opinion that submission to a jury of the issue raised by it was clearly within the court's discretion. I agree with the view expressed in Plews v. Burrage (C. C. A. 1st) 274 F. 881, at page 884, where, in discussing the effect of the statute here in question, it is said: "Whether issues of fact involved in such equitable relief should be submitted to a jury or determined by the court is, in our opinion, a question of judicial discretion. We are not able to accord with the view that the issue calling for equitable relief must first be tried by the court

alone, sitting as a court of equity. * * * While the verdict of a jury may in the equitable issue be advisory only, yet when such issue is, as in this case, simple and one eminently fit for submission to a jury, we think the practice adopted in the Barrett and Knickerbocker Trust Cases, supra [(C. C. A.) 265 F. 557; (C. C. A.) 247 F. 833], is the preferable practice, and the one most consonant with the spirit and purpose of the statute. The statute is remedial, and should be liberally construed in favor of a single, direct, and speedy trial of all issues involved in the litigation."

The case of Phillips-Morefield, etc., v. Southern States Life Ins. Co., 66 F.(2d) 29, from the Circuit Court of Appeals of the Fifth Circuit, is cited by defendant, and it must be admitted that the views indicated above are in conflict with that decision. But I cannot find agreement with the conclusion reached there. The effect of that decision is to so interpret title 28, § 398, U. S. C. (28 USCA § 398), as that the defense of false representations in an application for insurance which has for generations been recognized as a defense available in an action at law is now to be designated a strictly equitable defense no longer triable by legal procedure. With the added effect, from this change in nomenclature, that issues which, since the early days of our courts, have been tried at law and which the courts have repeatedly held must be tried at law, are now to be tried by the court sitting in equity, thereby depriving litigants of the right of trial by jury in cases where they have purely legal demands. I do not believe the statute ever intended any such result, and, while holding due respect for the court that decided the case referred to, I cannot bring myself to accept its conclusions until constrained to do so by the opinion of a court having a more direct authority over this one.

█ Being of opinion, as above stated, that the issue raised by defendant's special plea No. 4 was properly to be submitted to the jury, there was, I think, no duty to determine this issue apart from and previous to the trial of other issues in the case. In such case it is discretionary with the court whether the issues shall be tried separately or submitted together to one jury. In this jurisdiction it is not customary to submit special issues in the form of interrogatories to particular questions, but rather to ask for a general verdict based on all the defenses made after instructing the jury as to the nature of these and their applicability. The former course has been used by this court on occasion, but I think its use is discretionary, and in the present case the court saw fit to follow the usual Virginia practice. I am sure there was no error in doing so. The instructions given the jury clearly point out the separate issues to be considered by them in arriving at a verdict.

█ It is further contended that the court should have itself determined whether the representations made were material and should not have submitted this question to the jury. The position of the defendant is, apparently, that, under any and all circumstances, this question is for the court alone and is not to be submitted to a jury. In support of this there is cited the case of Flannagan v. Mutual Ins. Co., 152 Va. 38, 146 S. E. 353, 361, from which the following excerpt is quoted: "Whether a representation is made and its terms are questions of fact for the jury, but, when proven, its materiality is a question for the court."

If by this it is meant that the issue of materiality is always to be determined by the court alone, I think the statement is too broad. But I do not think the author of the above quotation meant it to have the broad and unconditional meaning that counsel imply to it.

A fair test of the materiality of a fact as applied to an insurance policy may be found in the question: Would information of the fact, imparted at the time of applying for the insurance, have caused an enhanced premium to be charged or led to a rejection of the risk? And this is to be determined by the practice and usage of life insurance companies generally. See Penn Mutual Life Ins. Co. v. Mechanics' Savings Bank, etc. (C. C. A.) 72 F. 413, 430, 38 L. R. A. 33, 63. Also the burden of proof of the materiality of a misrepresentation or concealment is upon the defendant. Piedmont, etc., Life Ins. Co. v. Ewing, 92 U. S. 377, 23 L. Ed. 610. A court cannot be expected to know the practices and usages of insurance companies generally or to know the importance or lack of it which they attach to the various physical complaints of applicants for insurance, as affecting the desirability of the risk. It is obvious, therefore, that it cannot be a sound general principle that, when the defendant has proven only that a false representation was made, it becomes the duty of the court forthwith to adjudge whether the representation was material. And I do not think that Flannagan v. Mutual Ins. Co. ever intended to lay down any such doctrine.

No different rule is applicable to determining the materiality of a representation in an application for insurance than to any other issue of fact. It is the subject of evidence, and to be treated as any other fact upon which evidence is introduced. Where the evidence of materiality is not disputed, or where the materiality is so apparent as to permit of no serious dispute, the matter should be taken from the jury. But this is equally true as to any issue of fact in any case. Where the evidence leaves doubt as to the existence of a fact the jury should be allowed to decide. This is all that is held in Union Indemnity Co. v. Dodd (C. C. A.) 21 F.(2d) 709, 55 A. L. R. 735, and is the rule in this circuit as well as elsewhere. It is to be noted that the language which defendant quotes from Union Indemnity Co. v. Dodd is in turn a quotation from Penn Mutual Life Ins. Co. v. Savings Bank, etc., to which I have previously referred and in which the opinion was written by Judge (later Chief Justice) Taft while on the Circuit bench. In the course of the same opinion, Judge Taft says: "It was clearly right in the trial court to refuse to direct the jury to return a verdict for the defendant on the ground that," etc. "was a fact material to the risk, as a matter of law. Where the parties have not, by the terms of the application and policy, impliedly stipulated that each subject inquired about shall be material, the question whether a fact is material to the risk is always a question for the jury."

Conceding that the previous health of the applicant, generally speaking, is material to the risk, it does not follow that every physical complaint previously experienced would by itself be material. The Virginia statute (Code, § 4220) provides that no statement in an application for insurance shall bar recovery upon the policy, anything in the policy to the contrary notwithstanding, unless it be clearly proved that such statement was material to the risk when assumed. The purpose of this statute is to prevent insurers from providing in the policy that any statement made shall be deemed material, whereas it might in fact be of the most immaterial and trivial nature. And the effect of the statute is to continue the long-established doctrine that materiality is a matter of fact which the insurer must prove.

As long ago as 1810, Chief Justice Marshall said in Livingston v. Maryland Ins. Co., 6 Cranch, 274, 279, 3 L. Ed. 222: " * * * The effect of the misrepresentation or concealment on the policy, depends on its materiality to the risk. This must be decided by a jury under the direction of a court." See, also, Mutual Ins. Co. v. Deale, 18 Md. 26, 79 Am. Dec. 673; Myers v. Mutual Life Ins. Co., 83 W. Va. 390, 98 S. E. 424; Continental Ins. Co. v. Kasey, 25 Grat. (Va.) 268, 18 Am. Rep. 681.

In Mutual Ins. Co. v. Deale, supra, it is said: "Whether such alleged misrepresentation or concealment will avoid the policy depends upon its materiality to the risk undertaken, and, in our opinion, the question of materiality is a question of fact to be submitted to the jury."

In Continental Ins. Co. v. Kasey, supra, the rule is thus stated: "Whether, indeed, the misrepresentation has affected the premium, or induced a policy, which otherwise would have been declined, are questions to be determined by the jury. Columbian Ins. Co. v. Lawrence, 2 Pet. 25 [7 L. Ed. 335]." See, also, Hardman v. Firemen's Ins. Co. (C. C.) 20 F. 594; Provident Savings, etc., v. Hadley (C. C. A. 1st) 102 F. 856.

The cases of Zogg v. Bankers' Life Co. (C. C. A.) 62 F.(2d) 575, and Union Indemnity Co. v. Dodd (C. C. A.) 21 F.(2d) 709, 712, 55 A. L. R. 735, both cited by defendant, sustain the above. In the latter of these it is said: "The usual rules as to the determination of questions of law and fact, or as to the province of the court and jury apply to insurance cases."

 It remains to be seen whether the court departed from the usual rule in the instant case. The false representations upon which defendant relies to avoid the policies consist in these: (1) That in answer to questions regarding the applicant's use of alcoholic beverages it was stated that he was a "very moderate user"; (2) that, in answer to a question as to the nature of any medical treatment received in the past five years, he stated that there had been none, and made a like answer to an inquiry as to whether he had consulted a doctor for any cause other than ones specifically inquired about. Defendant contends, as to the first alleged false statement, that the applicant's use of alcohol was more than "very moderate"; and, as to the second statements, that the applicant had in fact been treated for gonorrhea in 1924 and again in 1929.

As to the first of these, it need only be said that the evidence, in my opinion, failed to show that the applicant was an excessive user of alcohol. It did show that, like many other persons, he used alcohol at times and irregularly. There was a conflict of evidence

as to the extent of this use, and, under the circumstances, I am sure it was properly left to the jury to determine whether it was more than "very moderate" and whether it was such as that, had its exact extent been known to the company, it would have affected the issuance of the policy.

As to the second misrepresentation, it was proven that the applicant had been treated for gonorrhea in 1924 and 1929. It appears to be the contention of defendant that on this showing alone the court should have held that the misrepresentation was material, which means that it should have held as a matter of fact that the policy would not have been issued had it known of these treatments. This would have assumed a knowledge on the part of the court which it does not possess. That gonorrhea is a venereal disease whose occurrence is not rare, that by most of the medical profession it is considered curable and not serious, is about the extent of the court's knowledge. It did not know and had no manner of knowing the degree of importance which insurance companies attach to it as affecting the desirability of a risk, or whether it is the custom of companies to refuse insurance to any one who has previously had gonorrhea or to enhance the premium for such insurance. Without evidence in this regard the court was in no position to say whether the representations were material or not.

The physician who treated the insured for gonorrhea in 1924 testified that "it was a mild case with no complications" and that, after several months' treatment, "he was completely over the gonorrhea. He was entirely well." The same witness also says that, when gonorrhea has been cured, it leaves no effects upon the bodily health of the patient or his prospects of longevity. The physician who treated the insured for gonorrhea in 1929 testified that this was a mild case without complications, was treated about a month, and, so far as he could tell, was completely cured; and that, in his opinion, this case of gonorrhea would have no material effect on the applicant's bodily health or expectancy of life. The medical director of the Shenandoah Life Insurance Company was introduced by defendant to show the general custom and usage of insurance companies as to insuring persons who had had gonorrhea. But his testimony was indefinite and equivocal. In some of his statements he indicated that the companies regarded this disease quite seriously as affecting the risk; at another time he stated that, if a cure had been effected with no com-

plications and a year had elapsed since the cure, the applicant would be accepted as a normal risk.

A witness introduced by the plaintiff testified that in his experience insurance companies did not consider gonorrhea seriously. This witness (E. Guy Kyle) was an insurance underwriter, who had at one time been district manager for an insurance company and had taken a course of study in insurance. The court, having at first sustained objections as to his competency, later permitted him to testify after his statement that he was acquainted with the general practice and usage of insurance companies. It must be said that his testimony too was indefinite and uncertain and, together with that of defendant's witness on the same subject, left great doubt as to how far, if at all, knowledge of the gonorrheal infections would have influenced the issuance of the policy. When this testimony is considered with that of the physicians who stated that in both instances the gonorrhea had been cured with, in their opinion, no adverse effect on the applicant's health or expectancy of life, it must be said that there was no such definite proof of the materiality of these misrepresentations as would justify the court in taking this question from the jury.

It might be added here that the court's insistence that inquiries on the question of materiality be confined to the practice and usage of insurance companies generally was based on the authority of Penn Mutual Life Ins. Co. v. Mechanics' Savings Bank (C. C. A.) 72 F. 413, at page 430, 38 L. R. A. at page 63, wherein Judge Taft suggests the proper and exact form of such questions.

What has been said above is in explanation of the reason for admitting the testimony of E. Guy Kyle, which defendant assigns as error.

Another ground upon which defendant asks that the verdict be set aside grows out of the incident that, while the jury was in its room and before it reported its verdict, some of its members borrowed from the deputy marshal in attendance upon the jury his revolver, which they proceeded to examine and the operation of which they probably discussed in connection with the case before them. At the time the court dictated to the stenographer a recital of the facts attending this incident, which appears at page 448 of the transcript of the trial proceedings. These facts need not be repeated here. In response to questions asked by the court to each member of the jury, the court was of opinion that

their examination of the deputy marshal's revolver had not exerted any influence or given them any impression contrary to the evidence in the case. No apparent harm having been done to either litigant, the court exercised its discretion in refusing to declare a mistrial and thereby subjecting the parties to a repetition of this prolonged and expensive trial.

In this connection, I think the following should be noted: The revolver with which the insured was killed had been lost and was not introduced in evidence, but it was shown to have been a Colt revolver, .32 caliber, of a model known as "police positive." The defendant had introduced several witnesses who testified to the operation of this type of revolver and had caused these witnesses to exhibit before the jury revolvers of this type of different calibers and to explain their operating mechanism, which they said was similar to that of the revolver with which the insured was killed. The deputy marshal's revolver was a .38-caliber Colt police positive, so that what the jury had before it was a revolver of the same type that the defendant itself had introduced in evidence. If the jury, in the course of its deliberations, had requested that there be sent to the jury room for their examination one of the revolvers introduced in evidence, I think the request could properly have been granted. What they did was to procure a revolver of the same type in an unauthorized and irregular way and, while their action merited reprimand, I do not think it justified the declaration of a mistrial. It is logical to presume that, if the jury was influenced in any way by their examination of the deputy marshal's revolver, that influence was in favor of the defendant, which had introduced the same type in evidence. The motion for a mistrial seeks to take advantage of a mischance in the trial without pointing out any probability that defendant's interests were adversely affected by it and when the probabilities are to the contrary.

As to that assignment of error numbered 7, little need be said. It is apparently to the effect that, when any one handles a revolver for the purpose of cleaning or examining it, he must reasonably expect to be killed, and any injury to him is not to be held to be an accident, but the natural result of his act. This contention does not merit discussion, and the case cited in support thereof is in no way in point.

█ We come now to the contentions that the court should have directed a verdict for the reason that the evidence clearly indicated that the insured committed suicide, and that there was not sufficient evidence to justify a finding of accidental death, and that, for the same reasons, the court should now set aside the verdict rendered.

Cases of this sort have always been and will always be difficult. A human being is found dead; it is apparent that death was caused from a gunshot wound from a weapon found nearby, and that this gun was fired through some act of the deceased. But the question at once arises as to whether the wound was voluntarily inflicted with the intention of self-destruction or was the result of some unfortunate and involuntary mischance in the handling of the weapon. No other person has witnessed the event; there is no direct evidence to tell us of what really happened. We can seek the answer only through evidence of all the surrounding circumstances from which inferences may properly be drawn. And from these it is rare that conclusive or entirely convincing results are obtained.

It would be impossible here to review the mass of evidence which was offered as the result of careful and detailed investigation by both parties to this litigation. I will only state very briefly what, as it appeared to me, was the substantial result of this evidence. The physical surroundings attending the death of the insured were such as strongly to indicate that it was a case of suicide. I might say that I do not recall any physical fact which was strongly inconsistent with the theory of suicide. On the other hand, the same physical facts were not inconsistent with the theory that the revolver had been accidentally discharged. The location of the wound and the position in which the weapon was found would appear more probably to have resulted from a designed discharge of the revolver than from its accidental discharge. But they might have resulted from its accidental discharge; it was by no means impossible. There was no single physical fact or cumulation of facts that was in any sense conclusive upon either theory of the manner of death. There was no fact which could not reasonably be reconciled with either theory. And, when we search outside the physical facts attending the death and seek other sources which may help to a solution of the question, we find a similar lack of any evidence which is any way strongly convincing. Much help might be had if there were shown a motive for suicide or previous indications of an intention toward it, but the evidence as to these is not strong or convincing. It is contended that the

122

insured was in serious financial straits and there is suggestion of trouble about a woman. It seems clear that the insured owed a considerable sum and had lately borrowed money from sources which indicated that his need for funds was pressing. But the sum which he owed was not overpowering; his family was of substantial means and no reason appears why he could not or would not have called upon them for aid if his situation were in any way desperate. He was unmarried and without family responsibilities or worries. He was young, active, vigorous, and said to be of a cheerful and optimistic disposition. In view of all these circumstances, such financial difficulties as were shown are not greatly significant as indicating any motive for suicide. Men have killed themselves, of course, without any apparent motive or reason for their act; they become mentally unstable, they suffer delusions which create in their minds reasons for self-destruction. There is no evidence of any condition of this sort here. And the weight of the evidence is that prior to his death the insured had not exhibited indications of being morose or distressed or despondent or of any departure from his normal temperament. There was no "suicide note" or farewell message.

On these facts, I do not feel that the court was justified in instructing the jury that the evidence showed death by suicide, and that the defendant was absolved from liability.

 The defendant argues, as I understand it, that the long-established presumption against suicide is a presumption of law, effective only in the absence of evidence, and that, when evidence is introduced upon the subject in dispute, the presumption disappears and the issue is to be determined as if no such presumption had existed. It contends, apparently, that, when the defendant has introduced any evidence tending to show suicide, the entire force of the presumption against suicidal death is swept away, and there is a reversion to the usual situation wherein a plaintiff is compelled to prove affirmatively every element of his case, including the fact that the death was accidental. I do not believe that this is sound. The presumption against death by suicide is of more effect than the defendant would attribute to it. See the case of Parrish v. Order of United Commercial Travelers (C. C. A. 4th) 232 F. 425, 427, where there is a discussion of this subject. In that case the trial court had instructed the jury: "The court charges you that on the issue of suicide raised by the defendant as a ground for avoid-

ing the payment of the policy sued on, the burden of proof is upon the defendant to establish such defense. That the presumption, notwithstanding the finding of the dead body of the insured in the position described in the testimony, with his hands on the pistol lying between his legs, and the hole in his head, is that he met his death accidentally, and that the plaintiff is entitled to recover, unless the defendant can overcome the burden thus placed upon it; that is to say, unless the testimony excludes all reasonable hypothesis that the shooting was accidental, and you are convinced that the deceased intentionally took his life by inflicting the wound in his head."

In the above-cited case it is true that the jury found that the death was suicidal and there was no occasion for the appellate court to determine whether the above-quoted charge was unduly favorable to the plaintiff. But it is impliedly approved, for Judge Woods in his opinion cites the case of Cosmopolitan Life Ins. Co. v. Koegel, 104 Va. 619, 52 S. E. 166, as stating the rule to be: "Where the evidence of self-destruction is circumstantial, the defendant fails, unless the circumstances exclude with reasonable certainty any hypothesis of death by accident or by the act of another." And upholds this as a proper statement of the rule by citation of a long list of supporting cases. He further cites with approval the language of Judge Keith in Life Ins. Co. of Va. v. Hairston, 108 Va. 832, 62 S. E. 1057, 128 Am. St. Rep. 989, where it is said: "We are of opinion that the defense of suicide should be established by clear and satisfactory proof, such as is required to establish a fraud."

It follows that only when the proof of suicide is so clear and satisfactory, as that the court would be compelled to say that no other reasonable theory was possible, should the court direct a verdict for the defendant. Otherwise, the issue should be left to the jury.

The above is undoubtedly the general rule, and, while I agree with Judge Woods in his statement that, in view of the frequency of suicide, it cannot be doubted that some courts have gone very far in applying the rule of presumption against it, I am not in position to depart from a rule so well established. Nor should such departure be made in a case where the proven facts were such as particularly to require the determination of a jury. If the rule of presumption against suicide is ever to be loosened, the start should be made in a case where the evidence of suicide is more convincing than here.

While the above is the general rule, the plaintiff contends that different principles are applicable where, as here, suit is brought on that condition of the policy providing for double indemnity in case of death occurring through "external, violent and accidental" means. The policy in the instant case insured against death in the principal sum or face amount of $10,000, with a one-year suicide clause. There was an added condition that, if the death insured against should result from injuries effected solely through "external, violent and accidental means," the company would pay twice the face amount of the policy, i. e., $20,000. Suit was brought for the double indemnity alleging that the death of the insured resulted from "external, violent and accidental means." The defendant contends there is a distinction between a suit upon the policy for its face amount and a suit upon that condition or clause providing for double indemnity, in that, to recover the double indemnity the plaintiff must prove affirmatively that the death was caused in the manner mentioned in the double indemnity clause; that proof of external means, of violence, and of accident were all essential elements of plaintiff's case which must be proven and in the establishment of which no presumption existed.

In other words, defendant apparently admits that, had suit been merely for the death of the insured, for the $10,000 face amount, the plaintiff would have needed only to prove the death to cast upon the defendant the burden of proving a type of death—suicide—excepted from the risk, and against which there is a presumption; but contends that, suit having been brought for death by external, violent, and accidental means, a special type of death, the burden is upon the plaintiff to establish this special type of death, and that no presumption exists as to this. It is true that recovery for the double indemnity could not be sustained merely by proving that the insured was dead. There must have been proof that his death was in the manner for which the double sum was payable; and, had the mere fact of death alone been shown, no presumption would have arisen that the death was accidental. But the plaintiff proved more than the death; he proved beyond any question that death was due to external and violent means. This was not disputed. There arose immediately the question of whether this proven external violence was of an accidental or suicidal nature. It was conceded by the parties that it was one or the other; no suggestion was made of

any other origin of the wound. In such case the presumption against suicide attaches.

The defendant apparently contends that different rules exist where the policy insures against death generally and where it insures against accidental death. But the presumption against suicide exists in suits on accident policies. It is almost invariably in connection with such policies that it is invoked. The cases heretofore cited, in practically every instance, involved insurance against accidental death. And I can see no sound reason for applying a different rule because of the fact that the insurance against accidental death was in the form of an added condition to a policy insuring the life of the deceased generally. The contract here was in effect two policies of insurance; it was as if the insured had taken out one policy insuring his life generally in the sum of $10,000 and had taken a second policy insuring him for $20,000 in case death was caused by external, violent, and accidental means. Supposing he had only a policy of the latter sort, or supposing that, having had two separate policies, one covering death in any form and the other covering accidental death, recovery had been sought only on the accident policy. Would the contentions now made by the defendant apply? Plainly, they would not. Yet that is in effect the situation which we have here. The plaintiff has sued only on that provision of the policy relating to accidental death. He has not attempted to assert any other right. The defendant recognized this fact because it asked for an instruction telling the jury that there could be no recovery on the original policy for $10,000, that the jury was to consider only the provision for double indemnity, and this instruction in substance was given. The suit then in all effect was on a policy insuring only against death from accident.

The case of Parrish v. Order of United Commercial Travelers, hereinbefore quoted from, was one where the insurance was against accidental death, as were most of the other cases cited supporting the presumption against suicide. The defendant, in its brief, cites the case of Travelers' Ins. Co. v. McConkey, 127 U. S. 661, 8 S. Ct. 1360, 1361, 32 L. Ed. 308, to support its contention. An examination of this case makes a contrary showing. There the suit was on an accident policy, and the Supreme Court approved the following instructions given:

"The plaintiff exhibits the policy in evidence, and gives evidence of the fact that the insured was found dead, within the life of the policy, from a pistol shot through the

heart. This evidence satisfies the terms of the policy with respect to the fact that the assured came to his death by 'external and violent means,' and the only question is whether the means by which he came to his death were also 'accidental.'

"It is manifest that self-destruction cannot be presumed. So strong is the instinctive love of life in the human breast, and so uniform the efforts of men to preserve their existence, that suicide cannot be presumed. The plaintiff is therefore entitled to recover unless the defendant has by competent evidence overcome this presumption, and satisfied the jury by a preponderance of evidence that the injuries which caused the death of the insured were intentional on his part. * * *

"The defendant, in its answer, alleges that the death of the insured was caused by suicide.

"The burden of proving this allegation by a preponderance of evidence rests on the defendant. The presumption is that the death was not voluntary; and the defendant, in order to sustain the issue of suicide on his part, must overcome this presumption, and satisfy the jury that the death was voluntary."

Mr. Justice Harlan, in discussing this instruction, says: "Did the court err in saying to the jury that, upon the issue as to suicide, the law was for the plaintiff, unless that presumption was overcome by competent evidence? This question must be answered in the negative. The condition that direct and positive proof must be made of death having been caused by external, violent, and accidental means, did not deprive the plaintiff when making such proof, of the benefit of the rules of law established for the guidance of courts and juries in the investigation and determination of facts."

And we find that in the case of Tabor v. Mutual Life Ins. Co. (C. C. A.) 13 F.(2d) 765, decided in this circuit, there existed the same situation as in the instant case. There the policy insured against death generally with a "double indemnity" in case of death by accident. And the Circuit Court held that the presumption against suicide existed in a suit for the accidental death.

See, also, Mutual Life Ins. Co. v. Hatten, 17 F.(2d) 889, 890 (C. C. A. 8th), where the policy insured against death generally with a "double indemnity" clause in case of death from "external, violent * * * and accidental means." In that case the insurer paid the face amount of the policy, $10,000, for the death, and suit was brought for the additional sum of $10,000 due for accidental death. The company defended on the ground that the injuries resulting in death were not accidental, but intentionally self-inflicted. In an opinion upholding the action of the district court in submitting the case to the jury, Judge Kenyon says:

"That decedent shot himself, and that his death was the result of such external, violent means, is conceded; that he did so accidentally is plaintiff's theory; that he did so intentionally is defendant's theory. It is obvious that this is a question of fact. Ordinarily such question is for the jury. * * *

"The legal principles applicable to the situation presented are well established.

"Under the terms of the policy, in order to recover the additional $10,000, as provided therein, the burden was on the plaintiff to show that decedent shot himself accidentally. [Citing cases.] * * * Plaintiff, in carrying this burden of proof, is aided by the well-established presumption that death was not the result of suicide. [Citing cases.] * * *

"Where the evidence shows that insured was killed by external and violent means, there is a presumption also, when the evidence is doubtful as to whether the death was due to an accident or to suicide, that it was caused by accident."

In the light of the principles laid down in the cases heretofore cited, I am unable to see where there was error in the instructions given the jury in this case. If they erred in any way, it was that they were not as favorable to the plaintiff as might have been permissible. I claim no perfection for the language or substance of the charge to the jury, but I am sure it was not prejudicial to the defendant.

Upon consideration, I see no ground for setting the verdict aside, and the motion to do so will be overruled.